

**BC**

**1:25-cv-10890**
**Judge Robert W. Gettleman**
**Magistrate Judge Laura K. McNally**
**RANDOM / Cat. 2**

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**



**RECEIVED** LJ
9/10/2025
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

*September 9, 2025*

---

**Jeffrey Eisenberg,** Plaintiff

*v.*

**United Airlines, Inc.,** Defendant
233 South Wacker Drive 14ᵗʰ FL
Chicago, IL 60606

**Federal Civil Action Initiation**
Exercise right of removal pursuant to 18 U.S.C.A. §1514A(b)(1)(B) and further clarified in 29 C.F.R. § 1980.114

*(OALJ Case# 2025-SOX-00027)*

---

### COMPLAINT FOR RELIEF UNDER THE SARBANES-OXLEY ACT OF 2002, 18 U.S.C. § 1514A(b)(1)(B)

The evidence is unmistakable that Mr. Eisenberg meets all the requirements upon the filing of this complaint for the removal of his pending SOX claim that had languished for 257 days when he announced his intent to re-file it in Federal District Court. Under SOX, any matter that is timely filed with the Department of Labor for over 180 days has fulfilled the administrative exhaustion requirement and is eligible for removal.

Eisenberg acted in good faith and not only did not contribute to the delay, he filed a Motion to Expedite the case on August 4, 2025 but this was rejected by Judge Leslie for a second time. Judge Leslie also attempted to attempted to improperly assign responsibility for (or perhaps share blame for) the gratuitous contumacy that made it possible to be 257 days past initial report and unpled by defense.[1]

---

[1] Judge Leslie of course cites to Mr. Carter's support for a Stay that contributed to the delay. Recall that on May 14, 2025, Judge Leslie granted Carter's withdrawal request on the grounds that no hearings on dispositive motions had been scheduled. That was true, she had United's Motion to Dismiss of March 28, Plaintiff's responsive answer and a Response to the order for a show of cause why not grant the Dismissal on April 10, 2025. The ball was in her court to decide and get the ball rolling again. Carter violation of Eisenberg's trust is note excusable, but his incremental But by May 18, 2025, Eisenberg

**1**

Defendant challenged in its March 6, 2025 Motion to Dismiss that Eisenberg first raised the SOX allegation "on appeal." But this is clearly false: Eisenberg raised his SOX allegation at first contact with Department of Labor, on October 9, 2024.

**Standing.**

Plaintiff Jeffrey Eisenberg ("Eisenberg" or "Plaintiff") files this complaint within the statutory framework provided by the Sarbanes-Oxley Act of 2002 (SOX), 18 U.S.C. § 1514A(b)(1)(B), which permits removal to federal district court if the Secretary of Labor has not issued a final decision within 180 days of the complaint's filing, provided the delay is not attributable to the complainant's bad faith.

The evidence is unmistakable that Mr. Eisenberg meets all the requirements upon the filing of this complaint for the removal of his pending SOX claim that had languished for 257 days when he announced his intent to re-file it in Federal District Court. Under SOX, any matter that is timely filed with the Department of Labor for over 180 days has fulfilled the administrative exhaustion requirement and is eligible for removal.

Eisenberg acted in good faith and not only did not contribute to the delay, he filed a Motion to Expedite the case on August 4, 2025, but this was rejected by Judge

---

moved to reverse the still in place Stay. Instead Judge Leslie denied the motion and called it Moot. Moot she reasoned because she reset the case in an omnibus-stye order containing at least six other motions. The superseding scheduling order herein referenced could be found in the Omnibus order in footnote 15. and after Judge Leslie had granted Mr. Carter's withdrawal on the premise that the absence of scheduled hearings is proof that the withdrawal does not prejudice Eisenberg.

2

Leslie.[2] [3] Judge Leslie also attempted to blame shift the or perhaps blame share the gratuitous contumacy that made it possible to be 257 days past initial report and unpled by defense.

Defendant challenged in its March 6, 2025 Motion to Dismiss that Eisenberg first raised the SOX allegation "on appeal."   But this is clearly false: Eisenberg raised his SOX allegation at first contact with Department of Labor, on October 9, 2024.

---

[2] Judge Leslie also attempted to blame shift the prolonged delay in status conference by assigning some to Eisenberg's former attorney Adam Carter.  While Eisenberg takes issue with Carter's acquiescence to a stay on Defendant's statutorily set time frame to answer the pleadings complaint, it is hard to pin that protracted delay on Carter who has long since withdrawn relative to July 29, 2025 when Mr. Keegan James, assistant to Judge Leslie, putatively tendered both United's Pleadings Complaint Response ("PCR") and certification statements

[3] Prolonged delay to PCR began on April 1, 2025, when Judge Leslie stayed the response deadline to respond to Eisenberg's March 18, 2025 pleadings complaint on the same day Pleadings were due, that is, April 1, 2025.  Judge Leslie ordered Eisenberg show cause why not grant Respondent's March 28, 2025 Motion to Dismiss.  Eisenberg, at the time through counsel, timely responded to the Show Cause order and the statutory response window to reply to the March 28, 2025 motion.  Stated differently, Eisenberg, then by and through Counsel, timely replied to the Motion to Dismiss and the Order to Show Cause why not grant the same on April 10, 2025.  The Motion to Dismiss now had been filed and responded to and awaited a decision and the response to the Pleadings Complaint that was Stayed while the Motion to Dismiss was still pending remained stayed.  On May 18, 2025 nearly two months into this "stay"lemate, Eisenberg filed a "Motion to Reverse Stayed Deadline to Respond to March 18th Pleadings, Proposed Reinstated Deadline is May 23".   This is another proof point that Eisenberg sought good faith solutions to keep momentum up and agency decision withing a reasonable span of time.  Judge Leslie declared this Motion to unstay "moot" as she rebooted with a news scheduling order instead.  But the Defense who still had not filed response to Pleadings Complaint failed to reply on July 7, 2025 and she rolled the deadline forward to July 21, 2025.  On July 7, 2025 Judge Lesley also vowed to automatically reinstate the Motion to Dismiss from March 28, 2025.  The ambiguity arises from United asking for leave to file (or perhaps re-file) the Motion to Dismiss and Judge Leslie who obliged provided United file its Response to the Pleadings Complaint.  So the automatic reinstatement tied to a Pleadings Complaint response, i.e. conditional reinstatement, sowed confusion when July 21, 2025 came and Eisenberg had not received any service or indications of services or communication regarding service disruption.  There was not also a known mechanism to signal if an automatic presumably conditional reinstatement was actioned.  Proof of service of United's pleadings complaint response is still an open question, but if one takes a view Judge Leslie espoused in a July 29, 2025 ruling that the date of service is July 28, 2025, it does not clarify what then to infer about a hypothetically automatically triggered Motion to Dismiss reinstatement.  Of course, such a reinstatement it seems would be critical ground work for a conversion to Motion for Summary Judgment followed on August 25, 2025.

The next time this was substantively addressed by the Judge was August 25, 2025 upon Judge Leslie's sua sponte conversion of this same Motion to Dismiss to a Motion for Summary Judgement.  despite the double order that Eisenberg reply was shelved it seems indefinitely.  Indeed an attorney withdrawal was granted by Judge Leslie on May 14, 2025 on account of no dispositive hearings were scheduled at that time and the withdrawal therefore did not prejudice the Complainant.

**Figure 1**-Receipts for Eisenberg reported SOX to DOL upon first contact



**Foreign Corrupt Practices Act (FCPA) falls under the umbrella of Sarbanes-Oxley**

"I reported violations of company policy and what seemed to me to be clear corruption and likely illegal conduct under the FCPA. I reported this to HR and my boss, and multiple times (typically reported again when the situation escalated in some fashion)"

Eisenberg's Oct 9, 2024 retaliation complaint via OSHA's filing online (pg 4)

**Oct. 9, 2024 official report assigned tracking number 113604**

**Removal to Federal District Court After 180 Days**

| Topic | Details | Case Law | Proof points |
|---|---|---|---|
| Removal to Federal District Court After 180 Days | If Secretary of Labor has not issued a final decision within 180 days of complaint filing, employee may file lawsuit in federal district court for de novo review, provided delay is not due to complainant's bad faith | Feldman v. Law Enforcement Associates Corp., 752 F.3d 339 (2014)<br><br>Statue<br>18 U.S.C.A. § 1514A(b)(1)(B), 29 C.F.R. § 1980.114(a) | Eisenberg *motioned for expedited review* twice and was twice rejected by order of Judge Leslie; this evinces Mr. Eisenberg's interests were in coming to a proper resolution at all deliberate speed. |
| 180-day Period | Begins on date complaint is filed with OSHA; employee may proceed to federal court if no final decision within timeframe, even if administrative process is ongoing or advanced, as long as statutory conditions are met | Wong v. CKX, Inc., 890 F.Supp.2d 411 (2012) | Eisenberg explicitly references suspected violations of the Foreign Corrupt Practices Act in his online complaint *filed with OSHA on Oct 9, 2024, tracking # ECN 113604* |
| Jurisdiction | Federal district court has jurisdiction over such claims without regard to amount in controversy | Feldman v. Law Enforcement Associates Corp., 752 F.3d 339 (2014) | Not Applicable |
| Court Interpretation | Courts have consistently upheld this right, emphasizing the plain language of the statute | Wong v. CKX, Inc., 890 F.Supp.2d 411 (2012) | Not Applicable |

1

**Notice Requirements and Procedural Steps**

| Step | Requirement | Authorities | Example/Case |
|------|-------------|-------------|--------------|
| Notify DOL | Complainant must notify the DOL of intent to file a lawsuit before filing in federal court | Hanna v. WCI Communities, Inc., 348 F.Supp.2d 1322 (2004) | Initially filed June 23, 2025 and re-submitted at Judge Leslie's request June 24, 2025 |
| File Lawsuit | Subsequently filed lawsuit in federal court (29 C.F.R. § 1980.114) | Hanna v. WCI Communities, Inc., 348 F.Supp.2d 1322 (2004) | Filing today (under the stated threat of Judge Leslie dismissing case with prejudice beyond this date) |
| Serve Complaint | Within seven days of filing, provide copy of file-stamped complaint to OSHA, ALJ, or ARB & other relevant DOL officials | Stone v. Duke Energy Corp., 432 F.3d 320 (2005) | Eisenberg to notify electronically within seven (7) days of this filing |

**PREAMBLE: Timeliness, Statutory Authority, and Judicial Improvisation**

Plaintiff files this complaint within the statutory framework provided by the Sarbanes-Oxley Act of 2002 (SOX), 18 U.S.C. § 1514A(b)(1)(B), which permits removal to federal district court if the Secretary of Labor has not issued a final decision within 180 days of the complaint's filing, provided the delay is not attributable to the complainant's bad faith. Plaintiff's OSHA complaint was filed on October 9, 2024.  It was unmistakably part of the initial OSHA compliant filed over the online filing system, and given tracking number ECN 113604. Complaint explicitly refers to protections under SOX.

More than 180 days have elapsed without a final decision, and Plaintiff has twice moved for expedited review—both motions denied—demonstrating good faith and a consistent effort to resolve the matter at deliberate speed.

Despite this statutory clarity, the presiding Administrative Law Judge (ALJ), Judge Leslie, introduced a non-statutory deadline during a July 7, 2025 status conference that. The transcript reveals four distinct references to a 60-day expectation:

These statements, while procedurally suggestive, lack any basis in statute or regulation. The SOX framework provides a two-year statute of limitations from the date of the adverse action, and permits federal filing after 180 days of administrative delay. See Feldman v. Law Enforcement Associates Corp., 752 F.3d 339 (4th Cir. 2014); Wong v. CKX, Inc., 890 F. Supp. 2d 411 (S.D.N.Y. 2012). Plaintiff's filing today—September 5, 2025—is both timely and statutorily authorized.

Plaintiff includes this preamble out of an abundance of caution, recognizing that

**3**

Judge Leslie's improvised deadline may later be cited to disadvantage Plaintiff on procedural grounds. While Plaintiff disputes the legitimacy of any such deadline, this filing ensures that no prejudice can arise from its invocation. The record reflects procedural integrity, statutory compliance, and a consistent effort to preserve jurisdictional clarity.

Plaintiff expressly reserves all rights to seek injunctive or equitable relief should the administrative tribunal continue to interfere with the jurisdictional integrity of this federal action. While Plaintiff does not request a Temporary Restraining Order at this time, this filing is made under protest and in response to escalating procedural coercion. Plaintiff's compliance with Judge Leslie's improvised deadlines—including the July 7 "60-day" expectation and the August 25 "10-business-day" directive—is not a waiver of rights, but a protective act to preserve standing and prevent further prejudice. Should the tribunal take additional steps to obstruct or undermine this proceeding, Plaintiff reserves the right to seek appropriate relief from this Court

**4**

**STATEMENT OF STANDING**

On October 9, 2024, Plaintiff Jeffrey Eisenberg alleged that his employer United Airlines retaliated against him for whistleblowing in violation the protections held under AIR21 and in SOX.   As documented in the table below, each of the statutory requirements , Eisenberg notified the Court on June 23, 2025 that he was exercising his "take out" rights, following over 180 days within the Department of Labor in DOL without a finding from the Secretary.  The tables that follow itemize the legal elements necessary for the takeout with links to direct and indisputable evidence of the merits of the facts on each element.

Judge Leslie responded to Eisenberg's take out notification by scheduling a three (3) hour status conference, on July 7, 2025.  Mr. Eisenberg sought to maintain sterility of claims and asked but did not receive clear answer as to the nature of the conference.


**Clarification Regarding Consolidation.** Complainant respectfully clarifies that he did not request consolidation of the SOX and AIR21 matters. Any reference to consolidation in prior filings—particularly in the April 21, 2025 submission—was inadvertent and not intended to signal consent or strategic alignment. Had Judge Leslie accepted.

*Figure 2-Eisenberg re consolidation on 4-16-25 before he allegedly requested consolidation on 4-21-25, a contention Judge Leslie advances often*



The inclusion of such language was the result of collaborative drafting with counsel who subsequently withdrew, and Complainant has consistently maintained the sterility of each claim's jurisdictional environment. Assertions by the presiding ALJ that consolidation was requested mischaracterize the record and risk undermining Complainant's statutory right to de novo review in federal district court.

**The Amazing and Vanishing Mr. Carter.** Mr. Eisenberg signed a litigation agreement with The Employment Law Group ("TELG") on February 7, 2025, following an initial compensated case review.

6

TELG Managing Partner then assigned Attorney Adam Carter to Eisenberg's case on February 10, 2025, with an instruction to await more instruction from Mr. Carter or his legal assistant, Chris Johnston. Johnston opened contact on February 18, 2025 to set up an initial call on February 21, 2025 that lasted less than the half an hour. In the eleven (11) dormant days waiting to have a first meeting with my new attorney, TELG's invoice came to $8,909.50.

*Figure 3-Billing Velocity vs. Services defied all logic*



In between February 21, 2025 and April 25, 2025, when TELG notified Judge Leslie of its intent to withdraw from Eisenberg's case[4], TELG and Carter

---

[4] April 25, 2025 is as dated and described in Judge Leslie's April 29, 2025 Order for Eisenberg to Show Cause as to why not permit TELG's withdrawal.

- Failed to file 2 of the 4 claims in the litigation agreement,

- Failed to engage in settlement discussions despite at least ten (10) requests to do and to receive an update,

- Relatedly failed to follow up with a promised discussion on DOL-funded mediation,

- Failed to follow up on a open FOIA opened since before they were retained,

- Failed to follow up on a voicemail from OSHA Region V Investigator phone message circularly describing United's position statement as sourced by her supervisor,

- Failed to follow up on a later voice message in which Ms. Steward appeared to harboring a potential deal through her with United.

- Failed to promptly and properly correct a wrong filing that he insisted the night before needed to be sworn. Several days lagged between Eisenberg's discovery and Carter's eventual disclosure of the error made to the court. It was this incident in which Carter at first claimed to be unreachable because booked in six minute increments through rest of the day that he felt a tipping point was more than exceeded.

Eisenberg sought a meeting with Judge Leslie to discuss these matters but with his highest priority being disclosure and immediate correction to the docket as related to unsworn materials posing as sworn by Eisenberg and sworn materials intended for presentment to be so recognized.

Eisenberg could not get a clear affirmation that Carter even intended to notify

the Court, any further than the remedy he advertised to Eisenberg: an apparent gentleman's agreement he had cooked up with opposing counsel.

Eisenberg requested the meeting by email to Keegan James, the Judge's attorney advisor, and who she named an outreach functionary among other things. Mr. James replied to Eisenberg, copied in Eisenberg's lawyers, and United's lawyers, and advised Eisenberg to only communicate through his attorneys in the same note he acknowledges the request has to do with conflicts between attorney and client. This set in motion the trappings of a retaliatory withdrawal. But staging the withdrawal required cruel tactics with adverse consequences still reverberating today. Namely to file a Notice of Appearance – a CYA tactic for TELG but an everlasting source of opaqueness around authorization to act on client's behalf that any rational lawyer would anticipate could and would be weaponized against the client being abandoned.

These included filing his and also anyone at TELG's first notice of appearance with the Court on April 21, 2025. As the lawyer of record, he then filed his first filing as Eisenberg's attorney of record. This was implicitly rescinded by the firm' withdrawal on April 28, 2025 where ironically they notified Eisenberg in a meeting on accounting irregularities that he had requested of the accounting department. On the way out, TELG provided a certifiably incomplete case file and have never rectified it. Related to this, TELG provided a Trust account summary – not the transaction detail that Eisenberg requested. Even so conflicts with reported totals in monthly invoices and the correction of arithmetic errors leaves only one logical possibility that the Trust Account had been emptied out to $0 but the monthly trust data was wrong all along and each month, or the monthly invoicing was wrong, reflecting a balance of ~$13,000

9

at the latest invoice.

We stress Mr. Carter's Notice of Appearance has all the hallmarks of forensic counter measure and Eisenberg asked Judge Leslie a number of times to reinstate it to the docket where it was once posted.

Bottom line, for the Court itself, where a docket properly maintained would have kept order, the docket broke down where it was needed the most. We wrap with this exchange from the July 7, 2025 status conference where the topic came to a head with Judge Leslie.

> **MR . EISENBERG** : So that unopposed motion was unopposed by an attorney who did not file a Notice of Appearance with the Court on that date, and only did so on April 21st, only then to reverse, I guess , whatever they did on April 25th when they announced that they were intending to withdraw.

> **THE COURT** : Okay, so noted . ***That is in the record*** .
> ***[emphasis added]***
> Is there anything else you would like to comment upon or have me address, Mr. Eisenberg?

The answer to the Court sitting here on September 9, 2025 *is tell me where it is stored in the record*. The Notice of Appearance in question is dated April 21, 2025. It used

**10**

to be posted to the docket but now is not. Eisenberg asked that it be returned to the docket record on multiple occasions but this was never done. Refer to Eisenberg's July 24, 2025 filing "MOTION FOR CLARIFICATION ON RECENT DOCKET CHANGES" wherein he offers pointers on docket management one of which is: "Retain all previously posted items (e.g. TELG's Adam Carter's previously docketed Notice of Appearance filed 4.21.25 that ahs since been pulled down)"

**Figure 4-Snapshot of docket and dates neighboring April 21, 2025 where Carter's Notice of Appearance once was recorded**

| The judge issued an order. | Wed, 14 May 2025 | Order ORDER GRANTING MOTION TO WITHDRAW | PDF |
| Filing Received. | Tue, 13 May 2025 | FILING BY CLAIMANT - Response to Show Cause Order | |
| The judge issued an order. | Tue, 29 Apr 2025 | Order ORDER TO SHOW CAUSE | PDF |
| Motion Received. | Mon, 28 Apr 2025 | | |
| Motion Received. | Wed, 23 Apr 2025 | | |
| Motion Received. | Wed, 16 Apr 2025 | | |
| Filing Received. | Mon, 14 Apr 2025 | | |
| Brief Received. | Thu, 10 Apr 2025 | | |
| Filing Received. | Mon, 07 Apr 2025 | | |
| The judge issued an order. | Tue, 01 Apr 2025 | Order ORDER TO SHOW CAUSE | PDF |
| The judge issued an order. | Tue, 01 Apr 2025 | Order ORDER GRANTING RESPONDENT'S MOTION TO STAY DEADLINE | PDF |

### The Employment Law Group

The withdrawal notice from TELG, forwarded by legal clerk Chris Johnston atop the April 15 admonishment from Judge Leslie's advisor, evinces a retaliatory response

to Complainant's protected procedural outreach. This sequence—both in timing and presentation—suggests that TELG's withdrawal was not merely coincidental but a calculated reaction to Complainant's attempt to preserve the integrity of the proceedings. See Appendix Exhibit on Proof of Retaliatory Motive in TELG's withdrawal.

.

## COMPLAINT FOR RELIEF UNDER THE SARBANES-OXLEY ACT OF 2002, 18 U.S.C. § 1514A(b)(1)(B)

**Note on in dispute process of service of United's pleadings response**. United never properly served Eisenberg on the adjusted due date of July 21, 2025—111 days after the original responsive deadline to Plaintiff's timely filed March 18, 2025 complaint—nor on August 1, 2025, when a "courtesy" zip file containing 26 documents was delivered. A casual perusal of the zip file revealed a document purporting to issue a Notice of Appearance by email on July 7, 2025. Eisenberg received no direct communication from United's attorneys at O'Melveny to reconcile this discrepancy. While Eisenberg did not comb through all 26 files with forensic precision, the principle that one rotten apple spoils the bunch applies: proper service of a true and correct copy was never confirmed.

**Rule 36(a)(3) implications**. Judge Leslie's sua sponte conversion of United's March 28, 2025 Motion to Dismiss into a Summary Judgment ruling on August 25, 2025—without notice or lag time—effectively foreclosed discovery. Yet just eight hours prior, Plaintiff followed up with United's counsel regarding documents promised on May 12,

**12**

2025 that remain undelivered. This procedural ambush, combined with United's blanket objections to Requests for Admission and failure to respond to FOIA inquiries, results in multiple factual premises now deemed admitted under Rule 36(a)(3). These include, but are not limited to, the timeline of Plaintiff's reassignment, the nature of protected disclosures, and United's post-August 8 disengagement from placement efforts. Plaintiff respectfully submits that these admissions, arising from procedural default rather than speculation, reinforce the factual foundation of this complaint and preempt any argument that material facts remain in genuine dispute.

**FOIA Delay and Procedural Harm.** Plaintiff filed a Freedom of Information Act (FOIA) request on November 29, 2024, and refiled on December 27, 2024 after an initial denial under the "open investigation" exemption. Notably, OSHA formally closed the investigation to United Airlines on November 17, 2024, but did not issue a closure notice to Plaintiff until December 17, 2024—exactly one month later.

The requested materials include United's position statement to OSHA, correspondence between OSHA and United's counsel, and internal investigator notes. These documents are central to Plaintiff's whistleblower retaliation claims under SOX and AIR21.

Despite repeated follow-ups—including a check-in on September 5, 2025—the FOIA request remains unfulfilled. Meanwhile, United has cited these very documents in its filings, creating an asymmetry of access that materially harms Plaintiff's ability to respond.

**13**

The delay is not benign. It reflects a breakdown in procedural integrity that compounds the constraints already imposed by the tribunal. The denial of discovery, coupled with the unavailability of public records, has foreclosed access to key evidence and undermines the fairness of the administrative process.

Plaintiff Jeffrey Eisenberg ("Plaintiff" or "Eisenberg") files this Complaint of whistleblower retaliation against Defendant United Airlines, Inc. ("Defendant" or "United") for violations the Sarbanes-Oxley Act of 2002, 18 U.S.C. § 1514A *et seq.* ("SOX").") alleging United unlawfully retaliated against Eisenberg for his protected activities under SOX.

<u>Parties</u>

1.      Complainant is a resident of Chicago, Illinois, and was employed by United prior to his separation on or about September 2, 2024.

2.      United is a Delaware corporation that maintains its principal place of business in Chicago, Illinois.

<u>Factual Allegations</u>

**Background**

3.  United hired Eisenberg on or about May 15, 2017.

4.  Eisenberg initially served as United's Senior Manager for Network Planning before United promoted him to be its Director of Flight Profitability and Network Analysis in or about February 2020.

5.  United invited Eisenberg, based on his positive performance in his new role as Director, to participate in its leadership class for talented Director-level employees that took place from January 2022 to May 2022.

6.  Ankit Gupta ("Gupta"), United's Chief Air Operations Officer, recruited Eisenberg to fill a vacant director-level position within the operations team in or about June of 2022, shortly after Eisenberg completed this exclusive development programming.

7.  Eisenberg accepted the position offered by Gupta and began working in the new director-level role within operations in or about August 2022.

8.  United promoted Eisenberg once again in or about September 2023 to a position as Managing Director of Operations, Strategy and Performance.

9.  Gupta served as Eisenberg's immediate supervisor after Eisenberg was promoted to the new role as a managing director.

**Skylinx - Conflict of Interest**

10.  Eisenberg relayed concerns to Gupta about a project that Eisenberg inherited when Eisenberg was promoted to managing director because the project had

**15**

exceeded its budget and at that time was beyond the initially planned completion due date by two years. This project involved United working with a third-party contractor, Skylinx, to develop a software program called Skyplan for United's eventual use. United assigned Amar Murthy ("Murthy") a leadership position on the Skyplan project before Eisenberg assumed his new position.

11.     United initiated an investigation in response to Eisenberg's reports on the Skyplan project to Gupta.

12.     Eisenberg reported his mismanagement concerns in the Skyplan project to United Managing Director of HR Marcel Delhommeau ("Delhommeau") on January 10, 2024, and Eisenberg also provided Delhommeau with an email from Faiz Hanif ("Hanif"), United's director of digital technology, that suggested that Murthy's mismanagement could lead to safety compliance issues and that some members of Hanif's team believed Murthy potentially had a conflict of interest related to the Skyplan project because of a perceived personal interest that Murthy held in Skylinx.

13.     Eisenberg reported Murthy's perceived conflict of interests and potential violation of Murthy's duty of loyalty to United on or about January 10, 2024.

14.     United leaders learned of dissension among the Skylinx founders in November 2023 upon receipt of a memo from CEO Christian Grill indicating owners/founders were involved in a court dispute in Austria.

15.     In December 2023, Murthy and his then direct report Steven Boliek were spending significant time in Austria or in transit. This left scarce time to perform the core function to document, design, test and liaise with United dispatchers who worked locally in Arlington Heights, Illinois.

**16**

16.     United concluded its investigation into Murthy on or about February 7, 2024 and found no evidence of any wrongdoing.

Coincidentally, United had decided to wind down the Skylinx agreement in favor of repatriating the work to United. An envoy consisting of Eisenberg, Sreedhar Nara, Mohit Jain, and Faiz Hanif traveled to Salzburg, Austria in the February to negotiate an orderly winddown and transfer of knowledge. Prior to the group's arrival, Skylinx issued an announcement that it would be adding former Airbus Sales executive Tom Ronnel to its top management as its fourth member. An agreement was reached during the visit and United agreed to ~$1.2 million to obtain approximately two months of ongoing support to ease in the transition.

**HR Investigation**

17.     On February 19, 2024, HR Director Beth Nettles who oversees the HR Investigations unit and reports to Delhommeau called a meeting with Eisenberg for the next day, February 20, 2024. Nettles reviewed the allegations, which were submitted anonymously. The first allegation was that Eisenberg writes long emails, the second is that he discusses employee performance with others. The last one presented is that people on the team are unhappy and may quit. Eisenberg sometimes writes long emails and does not see any company policy prescribing email length. The complaint that the team was unhappy seems to conflict with Eisenberg's Pulse Survey Results. Eisenberg proffered in the interview with Nettles that Skyplan is co-managed with Sreedhar Nara – Managing Director of Digital Technology and Gary Zeman – Managing Director Flight Dispatch.

**17**

18.     On February 28, 2024, Director of Digital Technology, Faiz Hanif notified Sreedhar Nara and Eisenberg that Skylinx CEO Christian Grill had informed Hanif that Amar Murthy was the fourth member of the leadership team. This cohered with what Grill conveyed in a January visit to United in Chicago that initiated the first report – specifically that Murthy used his position at United and the access to steer business to the faction of owners he favored. Ronnell was effectively Murthy's surrogate. Grill also reported that in between the three negotiating sessions, Murthy was on the phone with the Skylinx owners Eisenberg emailed ShaVonne Richardson, Sreedhar Nara, and other senior leaders tasked with resolving the flight attendants' minimum issues present in Volare on or about March 11, 2024, and on or about March 22, 2024, Eisenberg reports concerns that the issues were unresolved.

19.     United awarded Eisenberg a performance related pay raise on or about March 13, 2024.  Gupta wrote: "Jeff – Pls see attached your 2024 comp statement, and the increase in your salary. Congrats again, and thanks for all your hard work."

20.     Eisenberg reported concerns to his supervisors in or about May of 2024 related to United's plan hastily to retire its Unimatic system (which was used for flight tracking, fuel planning, and weight and load planning) without an adequately prepared successor system in place.

21.     Eisenberg identified inadequacies and inaccuracies in United's Safety Risk Assessment process and brought concerns about the issues to Alex Burnett, Managing Director of Internal Audit on January 30, 2024 at McCormick Place Convention Center where United held its annual leadership conference.

22.     United conducted an internal "Pulse" survey in or about May of 2024 to

measure its employees' satisfaction level with their supervisors. Eisenberg's team participated in the Pulse survey at more than double the company-wide average, and 90% of respondents rated Eisenberg favorably (this was far better than the 69% company-wide average).

23.     Eisenberg's inclusivity responses were 95% favorable (better than the 70% company-wide average), and Eisenberg's overall employee satisfaction rating was a 4.14 (out of 5.0), which was far better than the 3.72 company-wide average. The Pulse results are running 12-month totals that randomly sample ~ one out of 12 employees per month. For the June 2024 Pulse report covering the 12 months ending in May 2024, the company modified would turn out to be Eisenberg's final Pulse report at United – and for this last Pulse of Eisenberg's the company went back and requested participation of anyone that had abstained prior to May. In that sense the results of May were uniquely more like a census than a survey.

24.     United elected to increase the size of the team led by Eisenberg by approximately 30% in a reorganization that was effectuated on or about May 29, 2024.

25.     Gupta commented in a team meeting on or about June 1, 2024, that Eisenberg had accomplished more in six months than Eisenberg's predecessor had in three years. Gupta made the same remark in a meeting with Gupta's boss Toby Enqvist on May 1, 2024. This meeting was used to walk Toby Enquist through team achievements since Eisenberg took over leadership of the team. Gupta repeated the remark about how accomplished Eisenberg is relative to his predecessor in spite of much shorter relative tenure in a meeting on or about May 17, 2024.

26.     Eisenberg reported continued non-compliance by United regarding the

**19**

required minimum number of flight attendants on active duty during the boarding procedure with Gupta and other senior leaders in a meeting on or about June 5, 2024

27.    Gupta asked Eisenberg to meet with Gupta and a human resources representative on or about June 6, 2024, and informed Eisenberg of Gupta's intent to remove Eisenberg from his position as managing director of operations, strategy and performance. Gupta did not provide Eisenberg with any clarity on the timeline for when this change might be carried out, stating at times during the meeting that Eisenberg might be transitioned out of his current role in a month and stating at other times that Eisenberg may remain in the position through the end of the summer or for up to four months.

28.    United, through Gupta, told Eisenberg on or about June 6, 2024, that United would work with Eisenberg to identify a mutually agreeable new position for Eisenberg if United did move him.

29.    Gupta advised Eisenberg on or about June 13, 2024, that Gupta thought Eisenberg should accept an offer to fill a vacant director level position in the financial portion of United's corporate structure. Gupta told Eisenberg during this conversation why Gupta thought Eisenberg was well-suited for the role and stated that Gupta hoped or knew they would work together again in the future.

30.    Gupta's statement to Eisenberg on June 13, 2024, misled Eisenberg into holding a reasonable belief that United did not intend to terminate Eisenberg's employment.

31.    Gupta also placed a call to Eisenberg in the evening on July 10, 2024. Eisenberg missed the call and noticed the next day, writing Gupta an email on July 11,

2024, that he noticed Gupta's missed call, and that he can chat at Gupta's convenience. Gupta wrote back he would call Eisenberg again later that day. However, Eisenberg never received a phone call or any further direct communication with Gupta from that point forward. The last direct communication Gupta and Eisenberg had had outside of this interaction was the previously discussed meeting on June 13, 2024.

32.     United's human resources personnel, including Krista Fischer, and United's chief financial officer, Michael Leskinen engaged in conversation with Eisenberg about United's efforts to identify potential new roles for Eisenberg throughout the remainder of June, misleading Eisenberg reasonably to believe that United did not intend to terminate Eisenberg's employment. United informed Eisenberg on or about June 25, 2024, that it intended to announce his position's replacement in a town hall meeting that would take place on or about June 26, 2024.

33.     Captain Joe Heins, the Vice President of the Network Operations Center ("NOC") and Eisenberg's newly appointed boss as of the May 29, 2024, reorganization called Eisenberg on the morning of June 25, 2024. Gupta had sprung on Heins that Gupta intended to announce Eisenberg's replacement at an all-Air Operations Virtual Town Hall the next day, June 26, 2024. Heins therefore intended to notify his direct reports that morning in advance of an expected 4pm deadline to send an announcement email to all of Air Operations about the new reorganizations ahead of the Town Hall the next day. All the hustle to beat that deadline was in the end unnecessary as for whatever the reason, the announcement email from Gupta ended up going out on June 26, 2024, anyway. Captain Heins told Eisenberg the name of his selected successor and moreover confided that he did not even have the replacement's signed

offer as of that moment. Heins also confided that he did not know Eisenberg's backfill well (in fact, he was selected by Gupta as opposed to Captain Heins). Eisenberg told Captain Heins that his named replacement is high quality. The two were enrolled in a half year long Director level leadership training program spanning the first half of 2022 and Eisenberg was sincere about his kind words toward his successor.

34.     As soon as Eisenberg began to worry the sentiment to find a home for him at United was changing – surely the publicity would make an internal job search significantly harder - an unexpected thing occurred. Someone on the virtual town hall posed the question: "What's going to happen with Eisenberg?" Gupta's delivery seemed to Eisenberg to turn warm and in direct contrast to the cold tone of the announcement email. Gupta, perhaps to appease the questioner or to portray himself more favorably, said that United is "working on something" for Eisenberg. The statement was effective at being soothing and seeming to reassure that an adverse outcome was to be avoided. It both irritated and soothed Eisenberg who now chalked up the poor execution and written announcements to surrogates of Gupta rather than Gupta himself. In summary, Gupta's statement on or about June 26, 2024, misled Eisenberg and others reasonably to believe that United intended to reassign Eisenberg to a new position rather than terminate his employment with the company.

35.     Eisenberg informed Leskinen on or about June 30, 2024, that a finance role they had discussed as a potential position for Eisenberg within United was not a suitable fit because it represented too large of a demotion.

36.     Eisenberg initiated an internal complaint of retaliation with United on or about July 3, 2024, indicating that Gupta's decision to remove Eisenberg from his

position was made in retaliation for Eisenberg's safety and corporate governance related disclosures and complaints of non-compliance.

37.     Eisenberg served this internal complaint memo to HR Director Leia DeVita on July 3, 2024.

38.     The relevant passage in Eisenberg's July 3rd memo for SOX retaliation is: "I have strong conviction that the initial action taken on June 6 and the series of events since are *retaliation primarily for whistleblowing concerns over corruption in an employee's relations with an international business vendor partner* and retaliation for reporting safety concerns in late 2023." (emphasis added here). Eisenberg's original complaint via the online OSHA whistleblowing portal included: "In another example, I reported violations of company policy and what seemed to me to be clear corruption under the FCPA. I reported this to HR and to my boss, and multiple times."

39.     HR Director Leia DeVita replied to the Memorandum of July 3, 2024 on July 5, 2024. She writes: "Hi Jeff – Thank you for your email. I have forwarded this complaint to the appropriate parties for their review. I will be in touch when I have more information."

40.     United failed to complete an investigation into Eisenberg's internal complaint of retaliation. In fact, Eisenberg was separated on September 2, 2024 and there was still no investigation to speak of. It was not until 86 days after July 3, 2024 that United's Deputy General Counsel and Chief Compliance Officer sought a meeting with Eisenberg. On September 20, 2024, an article in United's daily newsletter was published discussing Corporate Safety's roles and there it plainly said they are responsible for handling whistleblower investigations. Eisenberg reconfirmed with Ms.

23

DeVita who had promised to forward the complaint to the appropriate parties for review" on July 5th, and she advised she had or would send it to them as well. United's Deputy General Counsel in contrast and in contradiction with the article in the company-wide newsletter asserted that he has oversight of Corporate Safety which sat organizationally within Operations and not with Legal. When Mr. Garrison Phillips, Deputy General Counsel and Chief Compliance Officer, would not consent to the interview he requested being recorded, any investigation involving Eisenberg ended.

41.    United's director of human resources partners, Leia DeVita, invited Eisenberg on or about July 23, 2024, to meet with her on or about August 8, 2024.

42.    United, through DeVita, presented Eisenberg with a separation agreement on or about August 8, 2024. DeVita made no mention of Eisenberg's placement into a new role during their brief meeting on or about August 8, 2024, a departure from Eisenberg's past conversations with United's human resources.

43.    This also marked an important change of circumstance in that the severance proposal labeled the event a Reduction In Force or a RIF.

44.    Indeed the severance proposal contained required language because of the confluence of the OWBPA and a RIF triggering a 45 day consideration window.

45.    Ms. DeVita in the course of a month – all documented – tells Eisenberg he is in a RIF, then that he is not in a RIF, and then that he is in a RIF of 1. Also cited were a qualifying separation event, a furlough, and then only after Eisenberg was separated did DeVita cite performance as the reason for Eisenberg's separation. DeVita prepared a response to a personnel records request that Illinois state law

requires an employer to share. The 2nd page of the 96 pages tendered is a sheet labeling Eisenberg's departure as a Reduction in Force.

46.     Notably despite Eisenberg asking to see the list of Reduction in Force demographics as is required by law to be provided, United refused to comply with the law.

47.     It so happens that the 96 page employee file was over 70 pages of old performance reviews.

48.     United misled Eisenberg into reasonably believing that United intended to identify a new role for him within the company up until at least on or about August 8, 2024.

49.     United did not engage in conversation with Eisenberg about potential new roles within the company after August 8, 2024.

50.     United retaliated against Eisenberg for his past protected activities on or about September 2, 2024, when United ended Eisenberg's employment.

51.     United intentionally did not inform Eisenberg in clear terms at any point prior to his eventual termination on September 2, 2024, that United was disengaging or ceasing its efforts to find Eisenberg a mutually agreeable new role.

52.     Eisenberg initiated a complaint of retaliation with the Department of Labor on or about October 9, 2024.

53.     Eisenberg's initial written complaint explicitly discussed SOX issues upon the safety-related aspects of his protected activity.

54.     Eisenberg completed an oral interview with OSHA investigator Steward on or about October 11, 2024. Eisenberg informed Steward during the interview on or

**25**

about October 11, 2024, that, in addition to engaging in protected activity related to air safety concerns, Eisenberg also provided information to United as part of its investigation regarding Murthy's management of, and potential conflicts of interest related to, a United contract with an outside software development company, Skylinx.

55.     Eisenberg informed Steward during their call on or about October 11, 2024, that United misled Eisenberg into believing that United intended to reassign Eisenberg to a new position rather than terminate his employment.

56.     Steward provided Eisenberg with a template to fill in information regarding his complaint following their call on or about October 11, 2024. The template Steward provided to Eisenberg prompted Eisenberg to provide written summaries of Eisenberg's engaging in protected activities under AIR-21, but it did not ask Eisenberg to provide any information about the *prima facie* case of SOX retaliation that Eisenberg reported to Steward during their call.

57.     Steward failed to identify Eisenberg's complaint as implicating SOX's anti-retaliation provisions and did not ask Eisenberg any follow up questions about the Skyplan project management issues that Eisenberg raised in their October 11, 2024, interview as a factor in United's decision to reassign and ultimately terminate him.

58.     Eisenberg informed Steward, during OSHA's investigation of his complaint, that Gupta and other employees of United made comments in the months following June 6, 2024, that continued to mislead Eisenberg into believing that United intended to place Eisenberg into a new position rather than terminate his employment.

59.     United learned of Eisenberg's October 9, 2024, complaint of retaliation to the Department of Labor on or shortly before October 21, 2024.

**26**

60. United subsequently informed Eisenberg on or about October 21, 2024, that it was altering Eisenberg's eligibility to obtain future employment within United and that Eisenberg was similarly ineligible for hire with any of United's regional carrier airlines.

61. The Department of Labor's Occupational Safety and Health Administration ("OSHA") dismissed Eisenberg's complaint initiated on or about October 9, 2024, on or about December 17, 2024.

62. OSHA's dismissal of Eisenberg's complaint initiated on or about October 9, 2024, identified the complaint as untimely under AIR-21 because it erroneously accepted that United clearly informed Eisenberg of its intent to terminate his employment on or about June 6, 2024, when United misled Eisenberg into a reasonable belief that it intended to reassign him into a mutually agreeable position until at least August 8, 2024.

63. OSHA's dismissal of Eisenberg's complaint initiated on or about October 9, 2024, identified the complaint as untimely because it failed to acknowledge that Eisenberg orally provided a summary of events that made out a *prima facie* case of retaliation in violation of SOX. Eisenberg filed a timely appeal with the Department of Labor's Office of Administrative Law Judges of OSHA's dismissal of his complaint initiated on or about October 9, 2024, on or about January 16, 2025. Eisenberg initiated a complaint of retaliation with the Department of Labor on or about January 21, 2025, alleging that United's decision to blacklist him from eligibility for future employment in retaliation for his protected activities under AIR- 21 and SOX. This blacklisting claim will be ripe for amendment to this Complaint on or after March 24,

2025.

# Timeliness of Complaint

64.     The complaint initiated his first complaint of retaliation with the Department of Labor on or about October 9, 2024.

65.     Under Seventh Circuit precedent, two elements must be shown in a discriminatory discharge case to establish the date of the "unlawful employment practice." *Flannery v. Recording Indus. Ass'n of Am*., 354 F.3d 632, 640 (7th Cir. 2004). First, "there must be a final, ultimate, non-tentative decision to terminate the employee." *Id.* Second, "the employer must give the employee 'unequivocal' notice of *d.*

66.     United failed to provide Eisenberg with unequivocal notice of its final termination decision and engaged in actions which had a clear effect of misleading Eisenberg into a reasonable belief that, though he would no longer serve in his former position reporting to Gupta, that United intended to reassign Eisenberg into a mutually agreeable position.

67.     United represented to Eisenberg that United had disengaged from efforts to find him a new position and that he would be terminated on September 2, 2024, when he met with DeVita on August 8, 2024, was presented with a separation agreement for the first time, and when conversation of finding Eisenberg a new position within United ceased. Calculated from United's August 8, 2024, provision of a separation agreement to Eisenberg, which served as Eisenberg's first notice that United was contemplating terminating his employment rather than reassigning him to a new role, Eisenberg's October 9, 2024 complaint of retaliation in violation of AIR-21 is

indeed timely, as it was filed 62 days after he received notice of the adverse action that was effectuated on September 2, 2024. Eisenberg's complaint of retaliation under AIR-21 should not have been dismissed as untimely.

68.     Equitable tolling is appropriate when the defendant has actively misled the plaintiff respecting the cause of action. *School Dist. of Allentown v. Marshall*, 657 F.2d 16 (3d Cir. 1981).

69.     *Arguendo*, even if United evidenced an intent to terminate Eisenberg's employment on June 6, 2024, a conclusion that is not supported by the facts in this case, the circumstances in this case indicate that the 90-day statute of limitations under AIR-21 should be equitably tolled.

70.     Complainant Eisenberg's October 9, 2024, complaint also represents a timely complaint under SOX.

71.     The procedures for the Department of Labor's handling of retaliation complaints under Section 806 of SOX dictate that "a complaint will be dismissed unless the complainant has made a *prima facie* showing that a protected activity was a contributing factor in the adverse action alleged in the complaint." 29 C.F.R. § 1980.104 (e)(1). These same procedures proscribe that "the complaint, supplemented as appropriate by interviews of the complainant" must make the prima facie showing. 29 C.F.R. § 1980.104 (e)(1). Further, the procedures for filing a retaliation complaint under Section 806 of SOX provides that "oral complaints will be reduced to writing by OSHA." 29 C.F.R. § 1980.103 (b).

72.     Eisenberg's written complaint initiated on or about October 9, 2024, was followed by an oral interview with OSHA investigator Kathy Steward on or about

**29**

October 11, 2024, during which Eisenberg made a *prima facie* showing that his protected activity under SOX was a contributing factor in the adverse action alleged in his complaint.


## COUNT

**Sarbanes-Oxley Whistleblower Retaliation Sarbanes Oxley Act of 2002 – 18 U.S.C. §1514A et seq.**

73. Complainant reasserts and incorporates by reference all paragraphs set forth above as if restated herein.

74. Section 806 of SOX applies to any publicly traded company that holds a class of securities registered under Section 12 of the Exchange Act or any publicly traded company that is subject to the periodic reporting requirements of Section 15(d), or any officer, employee, contractor, subcontractor or agent of such company. 18 U.S.C. § 1514A(a).

75. United is a publicly traded company that holds a class of securities registered under § 12 of the Securities Exchange Act of 1934 (15 U.S.C. § 78l). United is listed on NASDAQ and files reports with the SEC. United is publicly traded on the New York Stock Exchange under the symbol UAL.

76. Eisenberg is a covered employee under SOX Section 806 of SOX protects employees who engage in protected conduct by "provid[ing] information, caus[ing] information to be provided, or otherwise assist[ing] in an investigation regarding any conduct which the employee reasonably believes constitutes" securities fraud, wire fraud, bank fraud, or violation of "any rule or regulation of the

**30**

Securities and Exchange Commission, or any provision of Federal law relating to fraud against shareholders."18 U.S.C. § 1514A(a)(1).

77.　Engaging in protected activity under Section 806 of SOX does not require an employee to report fraud, but only to disclose conduct the employee reasonably believes may violate any SEC rules or regulations, or any federal statute relating to fraud.

78.　Eisenberg reasonably believed that his predecessor's failure to address the significant cost and timeline overruns of the Skyplan project and United's failure to take action regarding Murthy's apparent conflict of interests in managing the project, constituted a violation of rules or regulations of the Securities and Exchange Commission and Federal laws relating to fraud against shareholders.

79.　Eisenberg placed United on notice of his concerns when he reported concerns about his predecessor's oversight of the Skyplan project that permitted the project to overrun deadlines and budgetary allocations over the previous two years and when he informed United investigators as well as Ankit Gupta of allegations that Murthy had potentially violated his duty of loyalty to United by developing a personal interest within Skylinx, the third party company whose work for United Murthy was tasked with overseeing.

80.　In violation of SOX, 18 U.S.C. § 1514A, and in retaliation for Eisenberg's protected activity of reporting a reasonable belief that United had failed to implement proper corporate governance procedures to prevent wasteful overspending and fraud and abuse on the part of one its employees who held a private interest in the project he was overseeing for United, United unlawfully removed Eisenberg from his position

as a Managing Director, terminated his employment at United, and blacklisted him from eligibility for future employment with United as well as its regional carriers.

81.     As a result of Respondent's violations of SOX, Complainant has suffered and is continuing to suffer injuries, including but not limited to, damage to his career and professional and personal reputation, paying attorney's fees and costs, and suffering economic damages, special damages, and compensatory damages. Complainant seeks all this relief, and any other relief available under SOX.

## **PRAYER FOR RELIEF**

WHEREFORE, Complainant Jeffrey Eisenberg prays that judgment be entered against Respondent for violation of the foregoing statutory causes of action as follows:

a)     Back pay;

b)     Reinstatement to his former position, or in the alternative, front pay;

c)     Compensatory, non-economic damages;

d)     Equitable relief;

e)     Special damages;

f)     Punitive damages under all counts for which punitive damages are available;

g)     Pre-judgment interest;

h)     Reasonable attorneys' fees, litigation costs, and court costs; and

i)     Any other such relief that the Court may deem just and equitable.

APPENDIX – Proof of retaliatory intent in withdrawal



***Figure 5-RFPD Failure to Complete Discovery***

 Outlook

**Re: Follow Up to Your 5/12/2025 Response to Request for Production of Documents 1-37 [still awaiting production of non-contested items that were pledged for delivery on 5/12/2025, 3 months ago]**

From  Jeffrey Eisenberg <jeffrey.eisenberg@gmail.com>
Date  Sun 8/31/2025 5:35 PM
To  Tristan Morales <tmorales@omm.com>; Gabrielle Jackson <gjackson@omm.com>

Hi, re-raising this, and would appreciate a response on the files you pledged to send on which you don't have a dispute - intended to eke out a modicum of progress wherever mutual agreement makes possible (not to be confused with conceding on any of the items in dispute)

Jeff

> On Aug 13, 2025, at 6:48 PM, Jeffrey Eisenberg <jeffrey.eisenberg@gmail.com> wrote:
>
> Hi OMM Team,
>
> Can you please advise when I can expect to receive the documents that you pledged to furnish on 5/12 in your response to request for production of documents?
>
> I can see where you noted various objections.  For now I would like to review the documents that you haven't objected to but pledged to provide as in the example of item number 10:
>
> RESPONSE TO REQUEST FOR DOCUMENTS NO. 10:
> Following a reasonable and diligent search, United will produce Eisenberg's personnel file, performance evaluations, performance surveys, and employment agreements
>
> Friendly reminder that 3 months have elapsed without production of any of the requested items 1-37.
>
> What's the ETA on the noncontested portion?
>
> Jeff

*Figure 6-Print of page 4 of ECN113604 submitted via OSHA's online filing system - Oct 9, 2024*

I took on a new role within United in Sep 2023 as Managing Director of Ops Strategy and Performance overseeing the implementation of new tools, tech and processes within the network operations center. I noticed within the first few weeks a cultural issue in which people were afraid to report severe bugs. In this first instance, the Minimum Equipment List data in our flight following system was corrupted and in all probability many flights were dispatched with faulty equipment when the system showed a clean bill of health for parts and plane on bad data. I referred this to my boss and instructed the responsible employee to report to corporate safety. As time went by, every few months or so, an issue as serious as this one would arise. Each one was reported in some fashion or another to my boss, officers in other departments such as Digital Technology and Human Resources where applicable. A few examples of these whistleblowing reports were alerting officers in management about defective flight attendant counts in our flight tracking system leading to airplanes boarded without sufficient number of active flight attendants. In another example, I reported violations of company policy and what seemed to me to be clear corruption and likely illegal conduct under the FCPA. I reported this to HR and my boss, and multiple times (typically reported again when the situation escalated in some fashion). Another area of concern was a sunset and replacement of a legacy operations system (known as Unimatic) that was in use for over 50 years. When the CHEP audit began and meetings with the FAA began to take place in person my access was restricted while others similarly situated was not. the Unimatic exit process was of high interest to the auditors and an area of m6eaningful risk to this day. Many of these issues would come to a head around the same time, ~around when I was notified of termination. I have ample proof of success in role - reasons provided are pretexts

2000 / 2000

**Is there anything else that that you would like OSHA to know about what happened?**

Not at this time, but I have maintained good documentation where possible, journaled many key events. I believe this will be helpful in researching any of these matters.

170 / 1000

# When you suffered the adverse action, who did you work for?

**Company Name (Required)** United Airlines

Submit Feedback